SAMUEL I. POPE ET AL.

v.

ELIAS LOWITZ.

1. QUESTIONS OF FACT—INSTRUCTIONS.—A court by submitting questions of fact to a jury, impliedly assures them that there is evidence tending to prove the facts so admitted. As the first instruction given submitted questions of fact which were not based on the evidence it was erroneous.

2. INSTRUCTIONS GIVING UNDUE PROMINENCE TO CERTAIN PORTIONS OF EVIDENCE.—An instruction calling the attention of the jury specially to certain portions of the evidence, bearing upon the question of the scope of a party's agency, thus giving such portions undue prominence and omitting other facts in evidence bearing upon the same question, is improper.

3. ILLOGICAL INSTRUCTION.—An instruction which requires the jury to find as to certain facts and then, instead of instructing them as to the legal consequences of such facts as found, announces a proposition of law which in no way follows as a consequence of the finding, but which is equally true and equally applicable to the case, whichever way the facts submitted are determined, is illogical, inconsequential and improper.

4. AGENCY—PAYMENT TO PRINCIPAL OF MONEY WRONGFULLY OBTAINED BY AGENT—CONSEQUENCES.—If an employe collects from a county $1,000 of money due his employers which he fails to account for to them

Pope et al. v. Lowitz.

and for which he is owing them, and by wrongfully assuming to act as their agent, borrows money from a third party, and a portion of such money so obtained is paid to his employers in satisfaction of the county indebtedness, and is received and applied by them on the supposition that it came from the county and was their money, as between the employe and his employers, the money belongs to the employers, and they have a right to retain it, and the fact that the employers subsequently learn that their employe, wrongfully assuming to act as their agent, had in fact borrowed the money of a third party, would not make it their duty to refund the money to such party under penalty of being deemed in law to have ratified the unauthorized act of their employe so as to become liable for the entire loan.

APPEAL from the Circuit Court of Cook county; the Hon. WILLIAM H. BARNUM, Judge, presiding.    Opinion filed December 21, 1883.

In this case, a judgment in favor of Elias Lowitz, the plaintiff, and against Samuel I. Pope and Charles H. Patten, the defendants, for $1,550 and costs, was entered by confession upon a cognovit and warrant of attorney, and afterward, on motion of the defendants, proceedings on said judgment were stayed, and leave was given to the defendants to plead.    The original declaration consisted of one count in assumpsit, upon a promissory note for $1,500, dated December 30, 1882, due twenty-four days after date, purporting to be executed by the defendants, by their firm name of Samuel I. Pope & Co., and payable to their own order, and by them indorsed, said note containing in the body of it a warrant of attorney, authorizing a confession of judgment in favor of the holder, for the amount appearing to be due thereon, with costs and attorney's fees.    Afterward, by leave of the court, the plaintiffs amended their declaration by filing the common money counts, and the defendants pleaded the general issue, and upon the stipulation of the parties, an order was entered giving leave to the defendants to avail themselves on the trial, under said plea, of all defenses, the same as though properly pleaded.

It appeared in evidence that the defendants were engaged in the business of putting into public and private buildings, machinery, apparatus and fixtures for heating such buildings by steam, and that on the first day of February, 1882, they

employed one Samuel R. Bullock to serve them in and about their said business. Said contract of employment was reduced to writing, and from the writing it appears that Bullock, for certain stipulated wages, agreed to devote his time, energies and business abilities to the service of the defendants for the term of one year, and to do everything in his power to further the interests, increase the business, and well and truly to serve them in the capacities in which they might choose to employ him, but the precise nature of his duties and extent of his powers as agent were not marked out or prescribed by the agreement.

Some time prior to the date of the note in suit, the defendants had entered into a contract with the county of Cook for putting steam heating apparatus into the county infirmary; and the business of carrying on said contract, and of collecting from the county the moneys becoming due the defendants thereunder, was committed by the defendants largely to said Bullock. In order to enable the defendants to realize the moneys due them from the county in advance of their payment in regular order, Bullock, as it seems, made an arrangement with one E. A. Filkins, who was then clerk of the county board, by which, in anticipation of the coming in of an architect's estimate, he could draw an order on said Filkins as clerk of said board, for the whole or a part of such estimate, and such order being accepted by Filkins, might be negotiated by the defendants and be afterward paid by the county treasurer, out of the moneys payable to the defendants on their contract. This scheme was communicated by Bullock to the defendants, and there being an architect's estimate in their favor for $5,088.82, the defendants drew an order on Filkins for $3,000, payable out of said estimate, and delivered it to Bullock, who obtained Filkins' acceptance. The order was returned to the defendants and by them negotiated, and it was subsequently paid by the county. Shortly afterward, as it appears, Bullock collected from the county the residue of the estimate, and paid over to the defendants only $1,088, representing to them that the county had held back $1,000 until certain boilers should be furnished for the infirmary, and

Pope et al. v. Lowitz.

that when said boilers should be delivered, the sum so held back would be paid. On the 30th day of December, 1882, the date of the note in suit, Bullock handed to the defendants the sum of $1,000, representing to them that it was the money previously retained by the county and now paid over, and the defendants so received and applied it.

It appears that on the 28th day of November, 1882, Bullock, desiring to borrow $1,000, went to one Julius Jonas, accompanied by Filkins, and applied to him for said loan. Bullock was introduced to Jonas by Filkins, as a member of the defendants' firm, and Bullock thereupon produced to said Jonas an order on Filkins for said sum of $1,000, said order being signed by Bullock in the name of the defendants and accepted by Filkins, and upon said order obtained from Jonas a loan for that amount. Said order was subsequently paid, and the evidence tended to show that such payment was made with the $1,000 collected by Bullock from the county, and withheld from the defendants as above stated.

A day or two prior to the date of the note in suit, Bullock applied to Jonas for a further loan of $1,500, and repeated the representations made on the former occasion by Filkins, viz., that he was a partner in the defendants' firm. Jonas not having the money introduced Bullock to the plaintiff, and rehearsed to him said representations as to Bullock's relations to the defendants. Bullock claimed that he wished to obtain the proposed loan for the purpose of paying the defendants' employes, and as security for said loan he produced an order for $1,500 on the clerk of the county board, payable to the order of J. Jonas & Co., and signed by him in the name of the defendants. Said order did not appear to have been accepted by the clerk of the board, but its non-acceptance was accounted for by Bullock by the fact that another person was then holding that office, who refused to accept orders of that character. Said order was not indorsed or assigned by the payees, J. Jonas & Co., but the plaintiff received it, and loaned Bullock $1,475, but required Bullock, as additional security, to make and execute to him, in the name of the defendants, the note in question in this suit. The money was paid over by the plaint-

iff to Bullock, in a check for $1,000, another check for $425 and $50 in currency, and the repayment by Bullock to the defendants of the $1,000 withheld from them, was made on the same day Bullock obtained the loan from the plaintiff. The defendants, at the time they received said $1,000 from Bullock, had no knowledge of the source from which he derived it, but supposed that it came from the county as represented by Bullock, nor had they any knowledge of the loan from the plaintiff, or of the execution by Bullock of said note and order.

There is no evidence apart from the representations of Filkins and Bullock to Jonas and the plaintiff, that Bullock was in fact a partner in the defendants' firm, but the evidence is directly and clearly to the contrary. It does not appear that the defendants had any knowledge of Bullock's executing commercial paper in their name, nor is there any evidence of any express authority on his part to do so. For the purpose of showing the nature and extent of his authority, however, Filkins was called as a witness, who testified that Pope, one of the defendants, in a conversation with him in relation to the defendants' obtaining a contract with the county, said that "Mr. Bullock represented them, the defendants, in connection with Cook county affairs; that everything he did, or was necessary for him to do, in relation to the matter, would be made right by their firm in every way." Also, that defendant Patten on another occasion, in a conversation with the witness, said that "In all things connected with the contract, Mr. Bullock was authorized to act for them in every particular, for the purpose of securing the contract and carrying it out, and in doing any and all business in connection with it." It also appears that Bullock was in fact intrusted by the defendants with the general management of their business growing out of the execution of their contract with the county.

At the instance of the plaintiff, the court gave to the jury the following instructions:

1. "If the jury shall believe from the evidence, that Samuel R. Bullock was employed by the defendants, on or about the 1st day of February, 1882, by a written contract

Pope et al. v. Lowitz.

entered into between them, and by which contract his duties were not particularly specified and pointed out; and that, after his employment, he was, by the defendants, appointed to be foreman of their store and business, and was directed from time to time by the defendants, or either of them, to solicit work from public and private corporations, and from the county of Cook, and to secure from the board of commissioners of Cook county, if he could, the acceptance of the defendants' bid upon the hospital and infirmary work, and to secure the contract therefor; and that the defendants, or either of them, introduced or represented him to E. A. Filkins as a representative of, or as interested in, the business of the firm of Samuel I. Pope & Co., and that Mr. Filkins was then the chief clerk of the board of county commissioners; and that in so introducing or representing Mr. Bullock, the defendants, or either of them, told Mr. Filkins, in words or in substance, that he was their representative, and had the power and authority to act for them, and that what he did as their representative in and about the county contract, in obtaining and carrying out the same, they would approve and confirm, then, whatever Mr. Bullock thereafter did within the scope of his authority, to be ascertained from the evidence under the instructions given you, was binding upon the defendants.

2. "And if the jury shall further believe from the evidence that as the work and the furnishing of materials upon the infirmary contract progressed, the defendants, or either of them, learned through Mr. Bullock, or otherwise knew, how money could be obtained in advance of payment by the county, and that they, or either of them, instructed or directed Bullock to aid them in procuring money in advance, and did not limit his authority, but left him free to do whatever appeared to him in his discretion to be necessary or proper to do to obtain the money, and sent him, or knowingly permitted him to go to Mr. Filkins for that purpose, without expressing or indicating to Mr. Filkins what were the limits of Mr. Bullock's authority, or whether he was limited at all as to the number of orders he might draw, if any, or as to the amount of money he might obtain, if any, or the use he was to make of the orders,

if any, in getting them cashed, then in law he was the authorized agent of the defendants to do whatever was necessary or proper to be done with such orders, to procure the money thereon for his principals, and they are bound by his acts, so far as the jury shall believe from the evidence he did act within the scope of his authority as the defendants' agent.

3. "And if the jury shall further believe from all the evidence in this case, that Mr. Bullock was authorized by the defendants, or either of them, to procure or draw orders upon Mr. Filkins, and to have them accepted by him, and to get them cashed, and that Filkins, as chief clerk of the board of commissioners, and Mr. Townsend, as assistant clerk, (if the jury shall find from the evidence that he was assistant clerk,) were informed of such authority, and that being so informed, Mr. Filkins introduced him to Mr. Jonas and through Mr. Jonas to the plaintiff in this suit, and that Mr. Townsend introduced him directly to the plaintiff in this suit, as a person duly authorized by the defendants to raise money upon such orders, and that the plaintiff herein, in good faith, and relying upon the truth of what had been so told him, lent to Mr. Bullock for and on behalf of the defendants, the sum of $1,500 upon an order, if drawn within the scope of authority, then the defendants are liable in this case, whether Bullock had the power to sign the note offered in evidence or not, and in that case the verdict of the jury should be in favor of the plaintiffs."

4. "And if from all the evidence in this case, and from all the instructions of the court, the jury shall find that the defendants did authorize Bullock to draw and negotiate the order in controversy, or orders generally for money in advance of the architect's estimates, or did knowingly permit him to do so, then, although the jury shall believe from the evidence that his authority did not extend so far as to justify his executing the note offered in evidence, still the plaintiff will be entitled to recover in this case, provided the jury shall believe from the evidence that he lent the $1,500 to Bullock in good faith, and relying upon the order which has been given in evidence herein. Authority of Bullock to execute the

note is not necessary to be proven to entitle the plaintiff to recover, provided you believe from the evidence that Bullock was authorized to execute the order and obtain the money upon it, and that he did actually obtain the money upon it.

5.  "But, although the jury shall believe from the evidence that Mr. Bullock was not expressly authorized by the defendants to draw or negotiate the $1,500 order offered in evidence in this case, yet, if the jury shall believe from the evidence that he did it, and that any part of the money which he received from the plaintiff upon such 'order, (if he did so receive it,) was delivered or paid to the defendants by him, and that such money has been used by them in the regular course of their business, with knowledge on their part that it was procured by Bullock upon such order, then they are liable in this case to the plaintiff for the full amount of the money, if any, which he lent upon such order.

6.  "And if the jury shall believe, from the evidence, that on the 30th day of December, 1882, Mr. Bullock delivered to the defendants the sum of $1,000, and that the money so delivered was a part of the money he received, if any, from the plaintiff, and if the jury shall further believe from the evidence that they did not know the source from which Bullock received the money, but afterward ascertained the truth to be that it came from the plaintiff, then it was the duty of the defendants, if they wished to repudiate Bullock's authority to obtain it, to refund such money to the plaintiff. The law will not permit the defendants, under such circumstances, to retain money, if obtained upon a forged order, or upon an order drawn and negotiated without authority by their agent or servant or employe, and then repudiate the order.  By keeping the money, under such circumstances, if proved, they, in effect and in law, ratify and approve what. Bullock did, and are thereby estopped from denying his authority."

The jury thereupon found the issues for the plaintiff, and assessed his damages at $1,500, and the court, after denying the defendants' motion for a new trial, vacated the judgment by confession, and entered judgment in favor of the plaint-

iff on the verdict.  The remaining facts are sufficiently stated in the opinion of the court.

Messrs. TAGERT & CUTTING, for appellants; that without some special authority, the agent can not bind his principal by negotiable instruments, cited Weber v. Williams College, 23 Pick. 302; Rossiter v. Rossiter, 8 Wend. 495; Smith v. Gibson, 6 Blackf. 369; Davidson v. Stanley, 2 Man. & G. 721; Gould v. Norfolk Lead Co., 9 Cush. 338; Lagow v. Patterson, 1 Blackf. 252; Temple v. Pomeroy, 4 Gray, 128.

Only repeated recognition of authority of agent to draw bills will justify conclusion of such authority:   1 Parsons on Notes and Bills, 100; Page v. Stone, 10 Metc. 160; Temple v. Pomeroy, 4 Gray, 128.

In interpreting the authority of the agent, it is to be construed strictly: Daniel on Neg. Inst., 3d ed., 292; Suwanee Mining Co. v. McCall, 3 Head, 619.

Language, however general in form, when used in connection with a particular subject-matter will be presumed to be used in subordination to that matter: Story on Agency, 9th ed., § 62; Wood v. McCain, 7 Ala. 800.

Evidence of the declarations of an alleged partner in the absence of his copartners, is never admissible to prove a partnership or allowed to bind copartners: Gordon v. Bankard, 37 Ill. 147; Degan v. Singer, 41 Ill. 28.

It was error to cross-examine appellant Patten upon an account before it had been mentioned in direct examination or offered in evidence: Stafford v. Fargo, 35 Ill. 481; Bell v. Prewitt, 62 Ill. 361.

An instruction which sets forth at length, facts as testified to by plaintiff's witnesses, and, upon the hypothesis of the belief of such facts, directs the jury how to find, is objectionable: Village of Warren v. Wright, 103 Ill. 298; Evans v. George, 80 Ill. 51; Martin v. Johnson, 89 Ill. 539; Logg v. The People, 92 Ill. 589; Ogden v. Kirby, 79 Ill. 555; Rockford Ins. Co. v. Nelson, 75 Ill. 548.

Instructions not based upon the evidence are erroneous: Martin v. Johnson, 89 Ill. 537; City of Freeport v. Isbell, 83 Ill. 440; Coggeshall v. Mates, 13 Bradwell, 117.

Pope et al. v. Lowitz.

As to the scope of authority of an agent: Evans on Agency, 61; Wurster v. Reitzinger, 5 Bradwell, 115: Kerr v. Sharp, 83 Ill. 199; Stein v. Kendall, 1 Bradwell, 103; Spooner v. Thompson, 48 Vt. 259; Dickinson v. Inhabitants of Conway, 12 Allen, 487; Reynolds v. Ferree, 86 Ill. 570; Vincent v. Ruther, 31 Tex. 77; Story on Contracts, §§ 160–1; Story on Agency, 9th ed., § 239.

Mr. G. W. Stanford, for appellee; as to evidence, cited McBean v. Fox, 1 Bradwell, 177; 1 Greenleaf on Ev., § 113; Collins v. Swan, 7 Robt. (N. Y.) 623.

Although a party's name to an instrument may be a forgery, yet he may so far approve and adopt it as that it will be as binding upon him as though he had in fact originally executed it himself: Livings v. Wiler, 32 Ill. 387.

One can not take the profits of a transaction and reject the burdens: Wharton on Agency, 89; Toledo, W. & W. R. R. Co. v. Chew, 67 Ill. 378.

Though an agent exceed his authority, the principal can not adopt one part of it and reject another: Newell v. Hurlburt, 2 Vt. 351; Gray v. Otis, 11 Vt. 628; Henderson v. Cummings, 44 Ill. 325; Hurd v. Marple, 2 Bradwell, 402.

Where an agent does any act for the use of his principal, and the principal enjoys the benefits and fruits of the act, he shall not afterward be allowed to say the act was illegal: Ruggles v. County of W., 3 Mo. 348; Cushman v. Lokeg, 2 Mass. 105; Low v. Conn. & P. R. R. Co., 46 N. H. 284.

Declarations made by an agent employed in negotiating sale of promissory note, regarding purpose for which same was executed, will be considered fairly within the scope of his agency, and will bind his principal: McBean v. Fox, 1 Bradwell, 177; Bernstein v. Bernstein, 11 Bradwell, 238; Wallace v. Gould, 91 Ill. 15.

Slight circumstances will sometimes suffice to raise presumption of a ratification: Meister v. Cleveland Dryer Co., 11 Bradwell, 227.

Bailey, J. The assignments of error in this case which

principally claim our attention are those which relate to the instructions given to the jury at the instance of the plaintiff. As to many of the facts in the case there is no serious controversy. Thus, it is not disputed that the defendants employed Bullock as their agent, and authorized him to take charge of various matters pertaining to their business. Nor is it disputed that while he was acting as agent for the defendants he borrowed of the plaintiff the money in controversy, and executed to him, in the name of the defendants, the promissory note and order which the plaintiff now holds. The main controversy relates to the nature and extent of Bullock's authority as agent, the question being whether he was authorized by the defendants to borrow said money and execute and deliver said note and order as security therefor.

The plaintiff's first instruction enumerates a large number of facts bearing more or less directly upon the nature and scope of said agency, and then tells the jury that if they find said facts from the evidence, then, whatever Bullock thereafter did within the scope of his authority was binding on the defendants.

One objection to the instruction is, that some at least of the facts which the jury are thus directed to consider, have no basis in the evidence. For instance, the jury are directed to find whether Bullock, after his employment, was appointed by the defendants to be foreman of their store and business. We find no evidence in the record tending to show such appointment. The utmost that can be said is, that there is evidence tending to show the employment of Bullock by the defendants as their general agent in some particular matters pertaining to their business, but it nowhere appears that he was appointed foreman of their business generally. Thus, the evidence tends to show that he was their agent or representative in their dealings with the county of Cook, both in the negotiation of contracts, and in carrying such contracts out and doing all business in connection therewith. These Cook county contracts, however, or rather the one contract which the defendants are shown to have obtained from the county, constituted but a small portion of the aggregate business of the defend-

ants. The position of foreman of their business generally was one importing more ample power and authority than that of general agent in respect to a particular matter or in the performance of a particular contract.

The instruction further required the jury to find whether the defendants or either of them introduced or represented Bullock to Filkins, the clerk of the board of county commissioners, as a representative of, or as interested in, the business of the defendants' firm. There is no evidence that the defendants introduced Bullock to Filkins as interested in the business of their firm, or that they made any representations to Filkins that he had any such interest. The defendants testify that all that passed between them and Filkins in relation to the character and extent of Bullock's authority was, that they answered in the negative a question put to them by Filkins as to whether Bullock was their partner. Filkins, on the other hand, testifies that both the defendants told him that Bullock was authorized to act for them in every particular in securing the contract and in carrying it out, and in doing all things in connection with it, but he does not pretend that they told him that Bullock had any interest in their business. Having an interest in the defendants' business might well have imported to the minds of the jury the relation of partner, a relation which, if it had existed, would of itself have conferred upon Bullock authority to borrow the money in question for his firm and execute on their behalf commercial paper for its security. The court, by submitting these questions of fact to the jury, impliedly assured them that there was evidence tending to prove the facts so submitted.

The instruction is also erroneous in calling the attention of the jury especially to certain portions of the evidence bearing upon the question of the scope of Bullock's agency, thus giving them undue prominence, and omitting other facts in evidence bearing upon the same question. It is like saying to the jury, " In determining the scope of Bullock's agency, these are the facts you are to consider."

But there is a still more serious difficulty with the instruc-

tion.    It is wholly illogical and inconsequential.    It requires the jury to find as to certain facts, and then, instead of instructing them as to the legal consequences of such facts as found, announces a proposition of law which in no way follows as a consequence of the finding, but which is equally true and equally applicable to the case, whichever way the facts submitted are determined.    The material question is as to the scope of Bullock's agency, but instead of submitting that question to the jury to be determined either from direct proof or as an inference from other evidential facts, it merely requires them to find certain facts from which inferences, either of fact or of law as to the scope of said agency, might have been drawn, but wholly fails to tell them what inferences would be proper, or what the force or effect or use of the facts, if found, would be in determining the issues in the case. It thus merely submits to the jury certain facts which of themselves and apart from the inferences properly deducible therefrom are unimportant; and follows with the legal truism that, whatever the agent did within the scope of his authority was binding on his principals.    Such an instruction, instead of aiding the jury in the determination of the issues, could only have had a tendency to confuse and mislead them.

The second instruction told the jury, in substance, that if the defendants instructed or directed Bullock to aid them in procuring money in advance of its payment by the county, and did not limit his authority, but left him free to do whatever appeared to him in his discretion to be necessary or proper to do to obtain the money, and sent him, or knowingly permitted him to go to Filkins for that purpose, without expressing or indicating to Filkins what were the limits of his authority, or whether he was limited at all as to the number of orders he might draw, or as to the amount of money he might obtain, or the use he was to make of the orders in getting them cashed, then in law he was the authorized agent of the defendants to do whatever was necessary or proper to be done with such orders to procure the money thereon for his principals, and they are bound by his acts, so far as he acted within the scope of his authority.

As Bullock himself was not a witness, the only evidence of the facts treated of in this instruction is to be found in the testimony of the defendants.    Patten testifies that shortly after handing in the schedule for their first estimate, Bullock told him that there was a custom at the county offices of allowing drafts to be made against the anticipated estimates in such form as to be available at the bank; that Patten told him to go and find out what the custom was, and he thereupon went and procured two blank orders of the form used by the county offices for that purpose.    These were orders on Filkins, as clerk of the county board, payable out of the esti‑ mates, and authorizing the holder to receipt to the county therefor.    These blanks were both filled up by Patten for the same sum, viz: $3,000, and signed with his firm name, Bullock telling him that one was to be filed with the county treasurer as his guide in paying the estimate, the other to be retained by the defendants.    Patten then delivered both of said papers to Bullock to take to Filkins to get his acceptance and one of them was afterward returned to Patten duly accepted by Filkins.    This order was subsequently negotiated by Patten at the defendants' bank.    It does not appear that the defendants ever employed or directed Bullock to assist them in obtaining money or orders of this character, or that they sent him to Filkins for that purpose, on any other occasion or in any other way, nor does it appear that they had any knowledge of his going to Filkins at any other time on that business, or of his drawing or negotiating or attempting to negotiate any other orders whatever.    Such being the facts presented by the record, it is manifest that the foregoing instruction is a mere perversion of the evidence.    It not only directs the jury to find upon facts of which there is no evidence, but authorizes inferences from those facts of which the record furnishes no warrant.

The fourth instruction requires the jury, among other things, to find whether the defendants knowingly permitted Bullock to draw the order in controversy, or to draw and negotiate orders generally for money in advance of the architect's estimates.    There is no evidence that the defendants

had any knowledge whatever of the fact that Bullock had drawn or negotiated the order in question until a considerable time afterward, nor do we find any evidence of their knowledge of his drawing or negotiating any other orders of the same character, and much less do we find evidence of the defendants knowingly permitting him to draw or negotiate such orders. The instruction to this extent has no evidence to support it, and is therefore erroneous.

The fifth instruction holds, that even if Bullock was not authorized to draw or negotiate the order in question, yet if he did so, and paid over to the defendants a portion of the money which he obtained on it, and that they received it, and used it in their business with knowledge as to how it was procured, they are liable for the full amount of the money lent on the order. The sixth instruction goes further, and holds that even if the defendants, at the time they received a part of said money, did not know the source from which Bullock obtained it, but afterward ascertained that it came from the plaintiff, then it was the duty of the defendants, if they wished to repudiate Bullock's authority to borrow it, to refund the money to the plaintiff, and that by keeping it they ratified Bullock's authority, and are estopped from denying it.

Had there been evidence tending to show that a portion of the money obtained by Bullock from the plaintiff was paid over to the defendants, and that they received and retained it, knowing at the time the source from which, and the circumstances under which, Bullock obtained it, the proposition of law announced in the fifth instruction would doubtless be correct. Such acts on the part of the defendants would be a ratification of the unauthorized act of their agent. But we are unable to find any evidence in the record tending to show such knowledge on their part.

On the day the loan was obtained, Bullock paid the defendants $1,000, representing to them that it was money collected by him from the county, being the sum previously withheld by the county officers, and there is no evidence that the defendants had any knowledge that the representation was untrue. And we find no evidence, apart from the mere coin-

Pope et al. v. Lowitz.

cidence in dates, that said money was in fact a part of the money borrowed from the plaintiff. The extract from the defendants' counsel's opening address to the jury, embodied in the bill of exceptions, in which he admitted that it might be a part of the money borrowed, if to be regarded as legitimate evidence at all, neither proves nor tends to prove that it was so in fact.

But the proposition laid down in the sixth instruction is, we think, clearly erroneous. Prior to the date of the loan from the plaintiff, Bullock had collected from the county $1,000 of the defendants' money which he had failed to account for to them, and for which he was owing them. The money obtained by Bullock from the plaintiff, if paid to the defendants at all, was paid in satisfaction of that indebtedness, and was received and applied by the defendants on the supposition that it came from the county and was their money. As between them and Bullock, it belonged to them, and they had a right to retain it. Did their learning some time afterward that Bullock, wrongfully assuming to act as their agent, had in fact borrowed it from the plaintiff, make it their duty to refund the money to the plaintiff under penalty of being deemed in law to have ratified the unauthorized act of Bullock so as to become liable for the entire loan? This question is satisfactorily answered by the case of Spooner v. Thompson, 48 Vt. 259. There an agent employed to buy goods for a principal, and to sell them at the principal's store, borrowed some money on the credit of the principal, without authority, and put into the principal's business, without the knowledge of the latter; it was held that the principal was not liable therefor to the person from whom it was borrowed, in the absence of a promise to pay, the court citing and applying the maxim that a party can not be made the debtor of another without his own consent. The case of Thatcher v. Pray, 113 Mass. 291, is also in point. There the plaintiff left a horse in the custody of one Gray to be kept for him through the winter, but gave him no authority to sell it. Gray afterward sold the horse to the defendant, and received in payment therefor a check which he indorsed and delivered to the plaintiff in payment of a debt which he owed

him, and the plaintiff, in ignorance of the sale, collected the check, and applied the proceeds to the payment of the debt. In an action to recover the value of the horse, it was held that the plaintiff's receipt and collection of the check was not a ratification of the sale, and that he had a right to receive and appropriate the check to the extinguishment of the debt in payment of which it was given to him.

Other questions are raised by counsel which we do not deem it necessary to consider, but for the error in the instructions above pointed out, the judgment will be reversed and the cause remanded.

Judgment reversed.